**WATKINS v. N.C. STATE BD. OF DENTAL EXAM'RS**

[157 N.C. App. 367 (2003)]

PAUL E. WATKINS, D.D.S., Petitioner v. NORTH CAROLINA STATE BOARD OF
DENTAL EXAMINERS, Respondent

No. COA02-759

(Filed 6 May 2003)

## 1. Dentists— negligence—rescheduling based on patient nonpayment

A de novo review revealed that the trial court did not err by reversing the State Board of Dental Examiners' final agency decision to suspend the dental license of an orthodontist based on the conclusion that the orthodontist's failure to treat a patient due to nonpayment amounted to negligence under N.C.G.S. § 90-41(a)(12), because: (1) an orthodontist's rescheduling practices are governed by N.C.G.S. § 90-41(a)(26) which speaks to unprofessional conduct and does not present a question of negligence under N.C.G.S.§ 90-41(a)(12); and (2) at the time the orthodontist rescheduled the patient due to nonpayment, she had terminated his services and was no longer a patient of record.

## 2. Dentists— breach of standard of care—failure to correct orthodontic problems in timely manner—failure to take facial photographs

A whole record review revealed that the trial court did not err by reversing the State Board of Dental Examiners' final agency decision to suspend the dental license of an orthodontist based on a finding that the orthodontist breached the standard of care for orthodontists regarding his failure to address or correct the orthodontic problems of two patients within a timely manner and his failure to take any intraoral and facial photographs of one of those patients, because: (1) the evidence regarding the delay for one of the patients did not show that any delay in treatment was the orthodontist's fault when the delay was the result of excessive appliance breakage due to either patient noncompliance or a faulty product, and there is no evidence the orthodontist failed to repair the patient's broken brackets as soon as his patient schedule permitted; (2) there was no evidence presented as to the applicable standard of care for orthodontists to support a finding that the orthodontist's treatment plan for the other patient was inappropriate; and (3) there is no evidence in the record to determine how the lack of intraoral and facial photographs would

inhibit an orthodontist's competence to properly diagnose a patient.

### 3. Dentists— standard of care—expertise of State Board of Dental Examiners

The trial court did not err by reversing the State Board of Dental Examiners' final agency decision to suspend the dental license of an orthodontist even though the Board contends that it was empowered under *Leahy v. N.C. Bd. of Nursing*, 346 N.C. 775 (1997), to determine the proper standard of care and breach thereof based on its own expertise if its experts' testimony was insufficient, because: (1) not only were none of the Board members orthodontists, but there is also no separate licensing requirement for orthodontists in this state; and (2) it cannot be said that the Board, whose members only practiced dentistry, had the expertise to determine the standard of care for orthodontists without any expert orthodontist testimony on the timely movement of teeth.

Judge HUNTER dissenting.

Appeal by respondent from order dated 5 April 2002 by Judge David Q. LaBarre in Wake County Superior Court. Heard in the Court of Appeals 18 February 2003.

*Rush-Lane & Lane, P.L.L.C., by Freddie Lane, Jr., for petitioner appellee.*

*Bailey & Dixon, L.L.P., by M. Denise Stanford, for respondent appellant.*

BRYANT, Judge.

The North Carolina State Board of Dental Examiners (the Board) appeals a superior court order dated 5 April 2002 reversing the Board's final agency decision to suspend the dental license of orthodontist Paul E. Watkins, D.D.S. (Dr. Watkins).

Based on the formal complaints of three of Dr. Watkins' patients, the Board held an administrative hearing to determine whether Dr. Watkins had violated N.C. Gen. Stat. §§ 90-41(a)(6), (12), and (13). The record and evidence presented at this hearing revealed the following as to the individual patients:

### Sabrina A. Wolfe

In her complaint dated 31 March 1999, Sabrina A. Wolfe (Wolfe) stated that she started seeing Dr. Watkins at his Greensboro practice in January 1997. Dr. Watkins placed braces on Wolfe's teeth, and according to Wolfe, she "received fair treatment" from his practice. "[A]round August or September of 1997," Wolfe "contacted the office . . . to tell [Dr. Watkins she] did not want to see [him] anymore because of financial reasons [and because she] wanted an office in High Point where [she] live[s]." At this time, Wolfe was told she still owed Dr. Watkins for his past services. In spite of her termination notice, Dr. Watkins' treatment record indicates that Wolfe came to the practice again on 8 October 1997 but was rescheduled "due to non-payment." On 26 November 1997, Wolfe presented herself to Dr. Watkins once more and was again not seen "due to non-payment."

Dr. N. Watt Cobb, Jr., the Board's expert witness on the Wolfe allegations, testified it was a breach of the standard of care for dentists, including orthodontists, to deny treatment to a patient of record who was delinquent in her payments without first giving that patient time to find another orthodontist. Based on this testimony, the Board found:

7. The standard of care for dentists licensed to practice dentistry in North Carolina at the time [Dr. Watkins] treated . . . Wolfe required that once orthodontic treatment is initiated, the dentist must continue to treat a patient with an outstanding balance until that patient has been formally dismissed by the practice and given a period of time to find another dentist to continue treatment.

8. [Dr. Watkins] violated the standard of care for dentists licensed to practice dentistry in North Carolina by failing to treat . . . Wolfe because she had an outstanding balance on her account.

Based on these findings, the Board concluded that Dr. Watkins' "failure to comply with the applicable standard of care in his treatment of . . . Wolfe as set forth in Finding of Fact No. 8 was a dereliction from professional duty constituting negligence in the practice of dentistry within the meaning of G.S. § 90-41(a)(12)."

### John Matt Casto

On 22 April 1996, John Matt Casto (Casto), a minor, presented himself to Dr. Watkins for an orthodontic consultation. Dr. Watkins

diagnosed Casto as having a Class I malocclusion with severely crowded locked-out maxillary bicuspids and severely crowded mandibular anterior incisors. Dr. Watkins considered extracting two of Casto's adult teeth but, in the end, decided to pursue a conservative approach using orthodontic appliances and avoiding extraction "until absolutely necessary." On 22 October 1997, Dr. Watkins finally recommended extraction, which was subsequently performed by another dentist. During the course of his treatment, Casto experienced excessive appliance breakage leading to a delay in his progress. Dissatisfied with the lack of progress, Casto's mother sought the services of another orthodontist in the fall of 1998.

Dr. Christopher John Trentini, an orthodontist, testified as the Board's expert witness with regard to Casto. While Dr. Trentini disagreed with Dr. Watkins' choice of treatment plan and testified that Dr. Watkins' treatment of Casto was behind schedule, Dr. Trentini did not state how far behind Casto's treatment was or that the delay violated the standard of care for orthodontists. Dr. Trentini also did not testify that Dr. Watkins' treatment of Casto was in violation of the standard of care. During cross-examination, Dr. Trentini conceded that excessive appliance breakage would extend a patient's treatment time.

The Board found in pertinent part that:

12. [Dr. Watkins'] orthodontic treatment of . . . Casto was inappropriate in that the treatment plan and subsequent treatments rendered failed to address the orthodontic needs of the patient in a timely manner.

13. The standard of care for dentists licensed to practice dentistry in North Carolina at the time [Dr. Watkins] treated . . . Casto required an orthodontist to establish and follow a treatment plan which would address the patient's orthodontic needs in a timely manner.

14. [Dr. Watkins] violated the standard of care for dentists licensed to practice dentistry in North Carolina by failing to establish and follow a treatment plan that would address the patient's orthodontic needs in a timely manner.

Accordingly, the Board concluded Dr. Watkins' "failure to comply with the applicable standard of care in his treatment of . . . Casto . . . was a dereliction from professional duty constituting negligence in the practice of dentistry within the meaning of G.S. § 90-41(a)(12)."

### Harry Conrad Naico

Harry Conrad Naico (Naico) sought orthodontic treatment from Dr. Watkins in December 1996 when Naico was twelve years old. Dr. Watkins diagnosed Naico as having a Class II malocclusion, a one hundred percent overbite, and a four to six millimeter overjet. Dr. Watkins recommended a treatment plan involving an upper biteplate with orthodontic appliances and therapeutic non-extraction with possible future extractions. Prior to initiating treatment, Dr. Watkins used as diagnostic tools a panorex radiograph, a cephalometric radiograph, trimmed study models, and a facial analysis but did not take any intraoral or facial photographs. According to Dr. Watkins, photographs are not necessary to properly diagnose a patient as they do not show anything that cannot be observed with the naked eye or that is not recorded by the facial analysis. In addition, photographs are not as useful as the three-dimensional trimmed study models or the radiographs which not only show the patients' teeth but also his jaw.

On 14 August 1997, Dr. Watkins placed Naico's orthodontic appliances. Since Naico did not progress as planned, Dr. Watkins considered possible extractions and surgery in May 1999. Dr. Watkins, however, did not pursue the possibility of surgery because "there are very few oral surgeons" in Greensboro and surgery would likely require travel to Chapel Hill. Thus, Dr. Watkins preferred to work out a plan that was reasonable for the patient unless surgery was needed "without a doubt." Since Naico's jaw was not yet fully developed, Dr. Watkins wanted to observe the development over the next year before reconsidering surgery. Dr. Watkins treated Naico for a period of approximately two years until Naico switched orthodontists.

Dr. James Dudley Kaley, also an orthodontist, testified as the Board's expert witness. According to Dr. Kaley, Naico's case was not an average case to treat but "an extremely difficult and involved one." Because it involved a skeletal problem, Dr. Kaley would have treated Naico through "a combination of braces and surgery." Surgery, however, would not be an option until after Naico's jaw had matured between the age of sixteen and twenty-one. Dr. Kaley considered surgery his "number one treatment choice." The second best would be a non-surgical treatment plan involving the use of a Herbst appliance along with braces to correct Naico's overbite. Dr. Kaley stated that failure to follow his treatment suggestions would violate the standard of care. Dr. Kaley further testified Dr. Watkins' treatment of Naico was inappropriate in that it failed to correct the patient's orthodontic problems in a timely manner, which Dr. Kaley's treatment

plans would have, and that this violated the standard of care. With respect to a non-surgical treatment plan, Dr. Kaley testified "it would probably take [him] a good two and a half years minimum."

Dr. Kaley also testified Dr. Watkins violated the standard of care by failing to take any intraoral and facial photographs prior to initiating Naico's treatment plan. Dr. Kaley expressed the opinion that such photographs are needed for proper diagnosis because he, at least, diagnoses patients in his office based on his records as opposed to when they sit in the chair in front of him. He offered no testimony as to the comparative value of photographs to the other diagnostic tools employed by Dr. Watkins. Dr. Kaley further stated had he been given photographs, he could have made a more accurate diagnosis of Naico when he evaluated him at the Board's request. When asked during cross-examination how he determined the standard of care for orthodontists with respect to intraoral photographs, Dr. Kaley replied: "my opinion [comes] from meeting many people, . . . that is the standard of care that everybody I know uses." Dr. Kaley did, however, concede that a leading treatise in the field of dentistry does not list intraoral photographs as among the minimal diagnostic records to be kept by dentists or orthodontists.

During cross-examination, Dr. Kaley acknowledged that different orthodontists will have differing opinions on the proper treatment of a patient. With respect to his two proposed treatment plans for Naico, Dr. Kaley explained: "I didn't say it was the only way. I said it was my way." He also testified that the standard of care is determined "[i]n retrospect," depending on "the way [the case] turned out."

The Board found as fact that:

17. [Dr. Watkins] failed to take, or have available, intraoral or facial photographs prior to initiating orthodontic treatment· for . . . Naico.

18. The standard for dentists licensed to practice dentistry in North Carolina at the time [Dr. Watkins] treated . . . Naico required an orthodontist to take, or have available, intraoral and facial photographs prior to initiating orthodontic treatment.

19. [Dr. Watkins] violated the standard of care for dentists licensed to practice dentistry in North Carolina by failing to take, or have available, introral and facial photographs prior to initiating orthodontic treatment of . . . Naico.

20. [Dr. Watkins] placed . . . Naico's appliances on August 14, 1997. [Dr. Watkins] continued . . . Naico in orthodontics for the following two years with routine adjustments.

21. [Dr. Watkins'] orthodontic treatment for . . . Naico was inappropriate in that it failed to correct his orthodontic problems within a timely manner.

22. The standard of care for dentists licensed to practice dentistry in North Carolina at the time [Dr. Watkins] treated . . . Naico required an orthodontist to formulate an appropriate treatment plan to remedy the problems diagnosed in a timely manner.

23. [Dr. Watkins] violated the standard of care for dentists licensed to practice dentistry in North Carolina by failing to formulate an appropriate treatment plan to remedy the problems diagnosed in a timely manner.

The Board then concluded Dr. Watkins' "failure to comply with the applicable standard of care in his treatment of . . . Naico . . . was a dereliction from professional duty constituting negligence in the practice of dentistry within the meaning of G.S. § 90-41(a)(12)."

As a result of its conclusions, the Board suspended Dr. Watkins' dental license. Dr. Watkins appealed the suspension to the trial court, which, in an order dated 5 April 2002, reversed the Board's decision based on a lack of competent evidence as to all three patients.

---

The issues are whether: (I) Dr. Watkins' refusal to treat Wolfe without payment falls within the purview of N.C. Gen. Stat. § 90-41(a)(12); (II) the testimony of Drs. Trentini and Kaley was sufficient to establish the applicable standard of care and breach thereof; and (III) if not, the Board was empowered to decide on its own the standard of care for orthodontists and the type of conduct constituting a breach of that standard.

In reviewing a superior court order examining an agency decision, an appellate court must, depending on the issues raised on appeal, determine whether the agency decision

(1) violated constitutional provisions; (2) was in excess of the statutory authority or jurisdiction of the agency; (3) was made upon unlawful procedure; (4) was affected by other error of law; (5) was unsupported by substantial admissible evidence in view

of the entire record; or (6) was arbitrary, capricious, or an abuse of discretion.

*Shackleford-Moten v. Lenoir Cty.*, 155 N.C. App. 568, 572, 573 S.E.2d 767, 770 (2002) (citing N.C.G.S. § 150B-51(b) (2001)). "Questions of law receive *de novo* review, while issues such as sufficiency of the evidence to support [an agency's] decision are reviewed under the whole-record test." *In re Greens of Pine Glen Ltd. Part.*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003). Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the agency. *Mann Media, Inc. v. Randolph Cty. Planning Bd.*, 356 N.C. 1, 13, 565 S.E.2d 9, 17 (2002). The whole-record test, on the other hand, requires the reviewing court to merely determine " 'whether an administrative decision has a rational basis in the evidence.' " *In re McElwee*, 304 N.C. 68, 87, 283 S.E.2d 115, 127 (1981) (quoting *In re Rogers*, 297 N.C. 48, 65, 253 S.E.2d 912, 922 (1979)). The whole-record test thus consists of an examination of "all competent evidence (the 'whole record') in order to determine whether the agency decision is supported by 'substantial evidence.' " *Amanini v. N.C. Dep't of Human Resources*, 114 N.C. App. 668, 674, 443 S.E.2d 114, 118 (1994).

I

**[1]** In his brief to this Court and during oral arguments, Dr. Watkins advocated that an orthodontist's rescheduling practices are governed by N.C. Gen. Stat. § 90-41(a)(26), which speaks to unprofessional conduct, and do not present a question of negligence under section 90-41(a)(12) as concluded by the Board. Dr. Watkins thus contends the Board made an error of law, reviewable *de novo*.

Section 90-41(a)(12) allows the Board to revoke or suspend a dentist's licence if he "[h]as been negligent in the practice of dentistry." N.C.G.S. § 90-41(a)(12) (2001). Subsection (a)(26), on the other hand, applies if the dentist, or orthodontist in this case, "[h]as engaged in any unprofessional conduct as the same may be, from time to time, defined by the rules and regulations of the Board."[1] N.C.G.S. § 90-41(a)(26) (2001). We agree with Dr. Watkins that rescheduling matters of the sort that occurred in Wolfe's case do not involve "the practice of dentistry." *See* N.C.G.S. § 90-41(a)(12). Instead, if questionable behavior arises in this context, it is more appropriately

---

1. Dr. Watkins further argues that the Board's rules and regulations are silent with respect to rescheduling and termination procedures and therefore failed to give him notice.

viewed as unprofessional conduct, which is defined as "[b]ehavior that is immoral, unethical, or dishonorable, either generally or when judged by the standards of the actor's profession." *Black's Law Dictionary* 292 (7th ed. 1999). We further note that even if section 90-41(a)(12) applied to the facts of this case as they pertain to Wolfe, there would be no violation of the standard testified to by Dr. Cobb, which illustrated the proper method of treating and discharging a patient of record. According to Wolfe's own complaint, she had terminated Dr. Watkins' services several months before the alleged incidents. Thus, at the time Dr. Watkins rescheduled her due to non-payment, she was no longer a patient of record. For these reasons, the Board erred in concluding Dr. Watkins' failure to treat Wolfe due to non-payment amounted to negligence under section 90-41(a)(12).

II

**[2]** "[P]rior to invoking disciplinary measures as authorized under G.S. § 90-41(a), the Board must first be satisfied that the care provided by the licensee was not in accordance with . . . a uniform statewide minimum level of competency among . . . licensees." *In re Dailey v. Board of Dental Exam'rs*, 309 N.C. 710, 723, 309 S.E.2d 219, 226 (1983). In this case, the Board found Dr. Watkins had breached the standard of care for orthodontists because his treatment of both Casto and Naico "was inappropriate in that it failed to [address or] correct [their] orthodontic problems within a timely manner." With respect to Naico, the Board also found that failure to take any intraoral and facial photographs violated the standard of care.

Having reviewed the whole record, we note that Dr. Trentini's testimony only established that Dr. Watkins' treatment of Casto was behind schedule. There was no testimony that the delay in schedule was so great as to violate the "statewide minimum level of competency" required of Board licensees. *Id.* Furthermore, the evidence presented at the hearing did not show that any delay in treatment was Dr. Watkins' fault. Rather, the delay was the result of excessive appliance breakage due to either patient noncompliance or a faulty product, and there is no evidence Dr. Watkins failed to repair Casto's broken brackets as soon as his patient schedule permitted. Accordingly, there was no competent evidence to support the Board's finding that Dr. Watkins had breached the standard of care for orthodontists by failing to timely address Casto's orthodontic needs. *See Amanini*, 114 N.C. App. at 674, 443 S.E.2d at 118 (review of "all competent evidence" must show "the agency decision is supported by 'substantial evidence' ").

The evidence with respect to Naico's treatment also failed to support the Board's findings. Dr. Kaley testified to what he believed to be the applicable standard of care and concluded Dr. Watkins had breached this standard by pursuing the treatment plan that he had, thereby failing to correct Naico's orthodontic problems in a timely manner. A closer review of his testimony, however, reveals Dr. Kaley did not testify as to the *minimum level of competency* required of a licensee but merely gave his opinion on the top two treatment plans he would have chosen for Naico. Dr. Kaley even acknowledged during cross-examination that his choices did not represent the only acceptable treatment methods; they represented "[his] way." Thus, there was no evidence presented as to the applicable standard of care for orthodontists to support a finding that Dr. Watkins' treatment plan for Naico "was inappropriate in that it failed to correct his orthodontic problems within a timely manner." *See id.*

While Dr. Kaley also testified that Dr. Watkins breached the standard of care for orthodontists by failing to take intraoral and facial photographs, there is absolutely no evidence in the record to determine how the lack of such photographs would inhibit an orthodontists' competence to properly diagnose a patient. Dr. Watkins indicated he had used all the diagnostic tools listed in a leading treatise on orthodontic care and that those tools were superior to intraoral and facial photographs for purposes of proper diagnosis. Dr. Kaley simply testified photographs would have helped him better diagnose Naico when he evaluated him for the Board and that, generally, they help him diagnose patients only because he prefers to make his diagnosis in his office as opposed to while the patient is sitting in front of him. Dr. Kaley did not explain though what diagnostic value photographs have in contrast to the radiographs, trimmed study models, and facial analysis taken and reviewed by Dr. Watkins. As such, Dr. Kaley's testimony failed to establish that intraoral and facial photographs are required as part of the statewide minimum level of competency required of orthodontists. *See Dailey*, 309 N.C. at 723, 309 S.E.2d at 226.

III

[3] The Board argues that even if its experts' testimony was insufficient on the standard of care for orthodontists or what constitutes a breach thereof, the Board was empowered pursuant to *Leahy v. N.C. Bd. of Nursing*, 346 N.C. 775, 488 S.E.2d 245 (1997) to decide these issues based on its own expertise. Finding *Leahy* to be distinguishable in this case, we disagree.

In *Leahy* our Supreme Court held:

Article 3A of the Administrative Procedure Act, chapter 150B of the North Carolina General Statutes, governs disciplinary hearings by professional licensing boards. N.C.G.S. § 150B-41(d) provides in part, "An agency may use its experience, technical competence, and specialized knowledge in the evaluation of evidence presented to it." N.C.G.S. § 150B-41(d) (1995). The knowledge of the Board includes knowledge of the standard of care for nurses. The Board currently consists of nine registered nurses, four licensed practical nurses, one retired doctor, and one lay person. The Board is authorized to develop rules and regulations to govern medical acts by registered nurses. N.C.G.S. § 90-171.23(b)(14) (1993). It is empowered to administer, interpret, and enforce the Nursing Practice Act. N.C.G.S. § 90-171.23(b)(1), (2), (3), (7). The Board is required to adopt standards regarding qualifications of applicants for licensure and to establish criteria which must be met by an applicant in order to receive a license. N.C.G.S. § 90-171.30 (1993). To meet these requirements, the Board must know the standard of care for registered nurses in this state. There is no reason it should not be allowed to apply this standard if no evidence of it is introduced.

*Id.* at 780-81, 488 S.E.2d at 248.

The rationale for allowing the Board of Nursing in *Leahy* to determine the standard of care based on its own expertise is not transferrable to the case *sub judice*. The Board of Nursing in *Leahy* consisted almost entirely of nurses. *See id.* In this case, not only were none of the Board members orthodontists, but there is also no separate licensing requirement for orthodontists in this State. Thus, whereas all orthodontists in North Carolina are trained in dentistry by virtue of the dental licensing requirement, not all dentists are trained in orthodontics. Dentists care for and remove teeth; orthodontists focus on the movement of teeth with the help of appliances. *See Webster's Third New International Directory* 603, 1594 (1968). Accordingly, it cannot be said that the Board, whose members only practiced dentistry, had the expertise to determine the standard of care for orthodontists without any expert orthodontist testimony on the timely movement of teeth. In light of the Board's composition in this case and the insufficient testimony of orthodontists Drs. Trentini and Kaley on the proper standard of care and breach thereof, we therefore affirm the trial court's reversal of the Board's decision.

Affirmed.

Judge ELMORE concurs.

Judge HUNTER dissents.

HUNTER, Judge, dissenting.

I respectfully dissent from the majority's opinion which affirms the trial court's decision to reverse the Board's suspension of Dr. Watkins' dental license.

I find the Board's ability to determine the standard of care for orthodontists to be critical when addressing the remaining issues discussed by the majority. With respect to this issue, the majority holds that the Board did not have the expertise to determine the standard of care for orthodontists or what constitutes a breach thereof. The majority reached its holding by distinguishing *Leahy v. N.C. Bd. of Nursing*, 346 N.C. 775, 488 S.E.2d 245 (1997), from the present case. However, this distinction is flawed due to the majority interpreting *Leahy* too narrowly.

In *Leahy*, our Supreme Court concluded that a North Carolina Board of Nursing that consisted of, among others, nine registered nurses, could properly revoke the license of another registered nurse in the absence of expert testimony defining the standard of care for a registered nurse because that board governs medical acts by registered nurses. Here, the majority holds that since the Board neither consisted of any orthodontists nor heard sufficient expert testimony from an orthodontist defining the applicable standard of care, the Board did not have the expertise to determine the standard of care for orthodontists. However, the majority fails to recognize that the *Leahy* Court also concluded as it did because there was "evidence in the record which the Board . . . use[d] its expertise to interpret, including its expertise as to whether the petitioner had violated the standard of care for registered nurses. From the record, [the *Leahy* Court was] able to determine the validity of the Board's action." *Id.* at 780, 488 S.E.2d at 248.

In the case *sub judice*, even though there were no orthodontists on the Board and, assuming *arguendo*, insufficient expert testimony establishing the standard of care for orthodontists, the Board (which consisted of all dentists) was entitled to use its experience, technical competence, and specialized knowledge to interpret the evidence

that was presented to it in order to determine the requisite standard of care. *See id. See also* N.C. Gen. Stat. § 150B-41(d) (2001). This evidence included, *inter alia,* patients' records, testimony from those patients, and testimony from experts in the field of orthodontics regarding the quality of care (or lack thereof) Dr. Watkins provided to those patients. Specifically, with respect to each patient, the evidence and my assessment of that evidence in light of *Leahy* is as follows: ·

### Sabrina Wolfe

There was uncontroverted evidence that Dr. Watkins rescheduled two of Wolfe's appointments because of non-payment and before receiving notification that she had found another orthodontist to continue her treatment. Dr. Cobb testified that due to the irreversible nature of an orthodontic program, an orthodontist violates the standard of care when he refuses to see a patient that has an outstanding account balance. He further supported this testimony by referencing guidelines established by the American Association of Orthodontists which detailed how to properly dismiss a patient. He testified that those guidelines require that in the event "there's nonpayment of a fee, you have to give [the patient] the opportunity to find another orthodontist and you have to be agreeable to transfer the case, you have to provide emergency care during that period of time." The majority concludes that despite this evidence, rescheduling practices are "more appropriately viewed as unprofessional conduct" instead of a violation of the standard of care. Yet, as the reviewing court, we are only to determine whether the Board's decision had a rational basis in evidence. *See In re McElwee,* 304 N.C. 68, 87, 283 S.E.2d 115, 127 (1981). With that in mind, I note that "standard of care" is very generally defined as "the degree of care that a reasonable person should exercise." Black's Law Dictionary 1413 (7th ed. 1999). Even under this general definition, I believe that the evidence presented to the Board establishes that a reasonable orthodontist would not have refused treatment to Wolfe for non-payment after having initiated an irreversible orthodontic program. Additionally, the majority concludes that Wolfe was no longer a patient of record since Wolfe's complaint alleged that she had terminated Dr. Watkins' services prior to his refusal to treat her due to an outstanding account balance. However, the Board did not make that finding. The evidence actually established that even if Wolfe believed she had "terminated" Dr. Watkins' services, she continued to be in need of and request those services to address problems related to her orthodontic program because she had yet to find another orthodontist or be formally dis-

missed by Dr. Watkins. Thus, when the Board interpreted the evidence in light of its experience, technical competence, and specialized knowledge, the Board had a rational basis to conclude that Dr. Watkins' rescheduling practices violated the applicable standard of care thereby resulting in negligence.

### John Matt Casto

Casto's patient records were offered into evidence and detailed the orthodontic treatment he had received while under Dr. Watkins' care for over two years. Additional evidence indicated that Dr. Watkins alleged his treatment of Casto was behind schedule due to the child's poor compliance with treatment instructions. Dr. Trentini testified that it was apparent Casto had not been practicing proper dental hygiene when the child first visited him after ending treatment with Dr. Watkins and that failure to do so could prolong treatment. Nevertheless, Dr. Trentini still opined that the child's progress was behind schedule and that he would not have treated Casto as Dr. Watkins did. When faced with conflicting evidence, the Board is responsible for determining the credibility of witnesses and resolving conflicts in their testimony. *In re Braun*, 352 N.C. 327, 332, 531 S.E.2d 213, 217 (2000). Therefore, the Board was entitled to use its experience and expertise to interpret the evidence and the patient records to ultimately conclude Dr. Watkins' treatment plan for Casto breached the standard of care by failing to timely address Casto's orthodontic needs.

### Harry Conrad Naico

With respect to Naico, his original diagnostic records compiled by Dr. Watkins were also presented into evidence. Dr. Kaley observed these records and personally evaluated Naico. On direct examination, Dr. Kaley admitted that Naico's case was extremely difficult to correct and that the child may have been non-compliant with treatment instructions. Despite these problems however, he opined that Dr. Watkins violated the standard of care for orthodontists by failing to adequately diagnose and formulate an appropriate treatment plan to correct Naico's orthodontic condition in a timely manner. Dr. Kaley based his opinion on Dr. Watkins' (1) failure to have adequate treatment records, (2) poor quality models, and (3) not presenting surgery as an option to Naico at the outset to correct Naico's orthodontic problems. Further, Dr. Kaley testified that he did not believe the treatment plan Dr. Watkins had developed for Naico would have addressed the child's orthodontic needs regardless of time.

Additionally, Dr. Kaley testified Dr. Watkins' failure to take intra-oral or facial photographs violated the standard of care for orthodon-tists. He testified that all other dentists he knew used intraoral photographs. He further testified that between 1996 and 1999, licensed dentists in North Carolina were required to take such pho-tographs prior to initiating orthodontic treatment. On cross-examina-tion, Dr. Kaley conceded that there was a learned treatise that did not indicate intraoral and facial photographs were necessary for minimal diagnostic records for an orthodontic patient. Nevertheless, as stated earlier, the Board and not this Court is responsible for resolving such a conflict. *See id.*

Accordingly, the Board's experience, technical competence, and specialized knowledge allowed that governing body to interpret the evidence presented regarding Dr. Watkins' treatment of Naico and determine that Dr. Watkins violated the standard of care by failing to (1) develop an appropriate treatment plan to timely address Naico's orthodontic needs, and (2) take the necessary photographs prior to initiating that plan.

Finally, despite the Board consisting of all dentists and no ortho-dontists, it still possessed the necessary expertise to determine the standard of care for orthodontists. Our Supreme Court has recog-nized that "[t]he North Carolina State Board of Dental Examiners, like all other professional licensing boards, was created to establish and enforce a uniform statewide minimum level of competency among its licensees." *In re Dailey v. Board of Dental Examiners*, 309 N.C. 710, 723, 309 S.E.2d 219, 226 (1983). Orthodontists, each of whom are trained in dentistry and have a dental license, also have their level of competency governed by this Board especially since there are no sep-arate licensing requirements for orthodontists in this state. Therefore, under *Leahy* the Board was empowered to decide the standard of care for orthodontists and which type of conduct consti-tutes a breach of that standard.

In conclusion, I believe this Court is able to determine the valid-ity of the Board's decision to suspend Dr. Watkins' dental license based upon the evidence in the record. Thus, for the aforementioned reasons, I would reverse the trial court's decision.